STATE OF CONNECTICUT     :
                         :
                         :   ss: New Haven, Connecticut
                         :
COUNTY OF NEW HAVEN      :   September 24, 2019

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Anabela Sharp, being duly sworn, depose and state as follows:

## BACKGROUND OF AFFIANT

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been so employed since January 2005. Since March 2017, I have been assigned to the Child Exploitation unit of the New Haven Division of the FBI. My primary duties in this unit include identification, investigation and assistance in the prosecution of individuals who are believed to have violated federal laws pertaining to child exploitation. These laws include those involving include child enticement, and the production, distribution, receipt and possession of child pornography, as well as individuals who violate federal laws involving child prostitution and sex trafficking.

2. I have participated in numerous criminal investigations of federal and state offenses including child exploitation offenses, narcotics offenses, sex trafficking and prostitution. In the course of those investigations, I have participated in interviews of witnesses and subjects in criminal cases. I have also participated in the execution of numerous search warrants for electronic media accounts and have been the affiant in many of those warrants.

3. Along with members of the Waterbury Police Department ("Waterbury PD") in Waterbury, Connecticut, and the United States Marshalls Service in this District, I am currently investigating Lester Joy ("Joy"), a 39-year old male born in 1980, and Crystal McGrath ("McGrath"), a 29-year old female born in 1990, for criminal violations to include kidnapping, in

violation of 18 United States Code, Section 1201, international parental kidnapping (for McGrath), in violation of 18 United States Code, Section 1204, and violation of the Sex Offender Registration and Notification Act ("SORNA") (for Joy), a violation of 18 United States Code, Section 2250 (collectively, the "TARGET OFFENSES").

      a.    This affidavit is being submitted in support of an Application for a Search Warrant to search and seize the contents of the following electronic devices, as more specifically described in Attachment A (the "TARGET DEVICES"), which devices were seized from McGrath by the Waterbury PD on or about March 30, 2019, following her apprehension and the apprehension of Joy and McGrath's three minor children in Mazatlán, Mexico. These devices include: One pink Samsung cell phone IMEI 354664/05/067256/2; one black/gray Alcatel cell phone IMEI 015295003034518; and one silver Samsung cell phone IMEI 354255097556189.

4.    On or about September 10, 2019, Waterbury PD provided the TARGET DEVICES to your Affiant to permit forensic examination by the FBI in New Haven, Connecticut. The TARGET DEVICES have not yet been forensically examined by the FBI or Waterbury PD, to date, and remain in the custody of the FBI in New Haven, Connecticut.

5.    Based on the information set forth in this affidavit, there is probable cause to believe and I do believe that the TARGET DEVICES contain items that constitute instrumentalities, fruits, and evidence of the TARGET OFFENSES, as specified in Attachment B, which is incorporated herein by reference.

6.    The information contained in this affidavit is based on my personal knowledge of this investigation, the knowledge of other duly sworn law enforcement officers and agents involved in this investigation, and law enforcement narratives that I have thoroughly reviewed relating to Lester Joy and Crystal McGrath, including, but not limited to those drafted by the

Waterbury Police Department and the United States Marshals Service regarding this investigation and prior cases and investigations relating to Joy and McGrath, in addition to documents obtained from cellular telephone providers and financial institutions obtained through federal and state subpoenas. Because this affidavit is for the limited purpose of establishing probable cause for the requested search warrant, it does not include all of the information gathered by law enforcement, to date, in this investigation. Rather, it contains information, which, based on my training and experience, I believe establishes probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES will be found within the data maintained on the TARGET DEVICES, as more fully described in Attachment A, which is incorporated herein by reference.

## DEFINITIONS

7. The following definitions apply to this Affidavit:

   a. "Minor," as used herein, is defined by 18 U.S.C. § 2256(1) to mean any person under the age of eighteen years.

## TECHNICAL TERMINOLOGY

8. Based on my knowledge, training, and experience, I am aware that a mobile or cellular telephone, commonly referred to as a cell phone, is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitters/receivers, enabling communications with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, cell phones offer a broad range of other capabilities. These capabilities include: running software or applications; storing contact names and phone numbers

in electronic address books, commonly referred to as a cell phone user's contacts; sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cell phones may also include a geo-location and global positioning system ("GPS") technology for determining the location of the device, to send and receive emails and to access the internet.

9. Based on my knowledge, training, and experience, I know that cellular telephones have the capability to allow it to serve as a wireless telephone, digital camera, portable media player and GPS navigation devices. These capabilities allow the cell phone to store information, pictures, and videos for long periods of time. Similarly, information that has been viewed via the Internet is typically stored for some period of time on such devices. In my training and experience, examining data stored on a cell phone can uncover, among other evidence, evidence that reveals or suggests who may have possessed or used the device as well as evidence of criminal activity. This information may be capable of recovery with forensics tools.

**FORENSIC ANALYSIS FOR ELECTRONIC DEVICES AND DATA**

10. Based on my training and experience, I know that analysis of electronically stored data, whether performed on site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but are not limited to, surveying the file directories and any individual files that the cellular telephone may contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer capable of containing the pertinent files in order to locate the evidence authorized for seizure by the warrant); conducting a file by file review of the data; examining all of the structured,

unstructured, deleted, and free space data on a particular piece of media; opening or reading the first few pages of each file in order to determine their precise contents; scanning storage areas to discover and possibly recover deleted data; scanning storage areas for deliberately hidden files; and performing electronic key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

11. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a drive or electronic media, deleted, or simply viewed via the Internet. Electronic files downloaded onto a hard drive or other media can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file, the data contained in the file does not actually disappear; rather, that data remains on the drive or media until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the drive or media that is not allocated to an active file that is unused after a file has been allocated to a set block of storage space for long periods of time before it is overwritten.

12. In addition, the operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of space devoted to these files and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a drive or media depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. As noted, it is not at all uncommon

to recover filed deleted months or even years prior to the forensic analysis of the device.

## THE INVESTIGATION AND PROBABLE CAUSE

13.     On or about February 16, 2019, Waterbury PD was dispatched to the McDonald's restaurant located at 530 Reidville Drive in Waterbury, Connecticut to speak with the complainant, a State of Connecticut, Department of Children and Families ("DCF") caseworker, regarding a child abduction complaint. The caseworker stated that she travelled to McDonald's to facilitate a supervised visit between three children, Minor Victim #1 ("MV1"), year of birth 2011, Minor Victim #2 ("MV2"), year of birth 2013, and Minor Victim #3 ("MV3"), year of birth 2017 and their mother, Crystal Ann McGrath, ("McGrath").

14.     At the time of the visit, the paternal grandmother of the three minor children, who lives in the State of Delaware, maintained physical custody of the children pursuant to a custodial order obtained by the Department of Children and Families in the State of Connecticut. 1 The caseworker explained that the grandmother drove to Waterbury, Connecticut from Delaware and rented a room at the local hotel with the three children for the purpose of facilitating the children's visit with their mother, Crystal McGrath, on February 16, 2019. The caseworker had previously participated in a supervised visit with McGrath and her children at the Brass Mill Center in Waterbury, Connecticut, when the children had also been driven to Connecticut by the grandmother to facilitate this interaction, with no complications during that visit.

15.     On the morning of February 16, 2019, while driving her state vehicle, the caseworker picked up the children at the hotel where they were staying and brought them to McDonald's for the visit, which was to occur between 11am and 3pm. During the visit, one of the children stated that they had to go to the bathroom and the caseworker permitted McGrath to take

---

1 The name of the grandmother and other of McGrath's and Joy's family members are known to your Affiant but are not identified in this affidavit for the privacy of those persons.

6

the child and the two returned soon thereafter. Later during the visit, McGrath told the caseworker that she was taking the children to use the bathroom so that she could clean them up after they ate ice cream, which McGrath purchased for them when they requested a snack. According to the caseworker, McGrath stated that she did not want to take the children to the bathroom one at a time, so she waited for all three to finish and then took them all to the bathroom.

16. After about 10 minutes, McGrath had not returned with the children, and so the caseworker went to check on them as she thought they were taking too long. The caseworker checked all of the bathrooms and areas inside of the McDonald's, calling their names, but did not find McGrath or the children. She did, however, note that the children's coats, the rest of their snacks, and the diaper bag for the youngest child, remained at the location where they had been seated. The caseworker immediately notified Waterbury PD and her DCF supervisor of the disappearance of McGrath and the three children.

17. The caseworker subsequently advised the Waterbury PD in a sworn statement that she did not know the method of transportation McGrath used to get to McDonald's or whom she may have been with, if anyone, as McGrath was there when the caseworker and the children arrived. The caseworker did not know where Crystal may have taken the children or whether she left in a vehicle or on foot. The last time the caseworker participated in McGrath's supervised visit at the Brass Mill Center in Waterbury, the caseworker observed that McGrath travelled to and from the visit with a black male who was driving a red Volvo. The caseworker did not know if McGrath would harm the children but knew that McGrath had made threats to harm herself and her children in the past and that McGrath was believed to have mental health issues.

18. The caseworker advised that McGrath used cell phone number (203) 694-2290. A GPS locate was immediately attempted on the phone number, but it was learned that it was

powered off. The caseworker described McGrath as a white female, chunky build, with long blond hair, wearing black tights, and a black "flary" shirt.

19. Connecticut State Police immediately issued a Silver Alert. Surrounding towns and states were also notified in addition to Metro North train station authorities. Photos of the red Volvo, McGrath, and the children were also distributed via Slack, a police information website.

20. On or about February 16, 2019, Waterbury PD seized surveillance videos from McDonald's restaurant that captured McGrath and her three children exiting the restaurant. Your Affiant reviewed the surveillance videos recorded on February 16, 2019 (according to video time stamp). Your Affiant observed on one of the cameras inside of the restaurant a grainy video of a female fitting the description of McGrath taking three children out of McDonald's through a rear exit door of the building. Prior to exiting the restaurant, one of the children walked away from McGrath towards the seating area and McGrath can be seen waving the child to come back to her. The child can be seen on the video returning back to McGrath and she and the three children proceeded to walk out of the restaurant.

21. Another camera angle captures McGrath and the three children walking towards a vehicle waiting in the side lot. At approximately the same time, that McGrath and the children exit the restaurant, your Affiant observed a vehicle back up out of a parking spot and proceed forward. At this point, the vehicle's view is obstructed by a pickup truck that is parked in front of it. McGrath and the children stop near the pickup truck and it appears to your Affiant that they are getting into a vehicle that is parked next to the pickup truck. Due to location of the pickup truck, your Affiant is not able to observe McGrath and the children enter the vehicle. After a short period, McGrath (only the upper shoulders and head) can be seen walking around what appears to be the rear of the car.

22. A third camera view shows what your Affiant believes to be the vehicle that McGrath and the children entered leave the McDonald's parking lot. The camera angle captured what I believe to be a red four-door vehicle, possibly with tinted windows, and a sunroof, leaving from the rear of McDonald's.

23. Through the course of the investigation, McGrath's boyfriend was identified as Lester Wilfong-Joy, of 37 Laurel Street, 2nd Floor, in Waterbury. Joy is a registered sex offender from the State of New Jersey, based on his conviction for sexual assault involving a 14-year-old female in October of 2002, resulting in a sentence of three years in custody, lifetime community supervision, and lifetime sex offender registration. Joy was thereafter convicted in Suffolk County New York, in January of 2006 for disseminating indecent material to minors, rape 3rd degree (2 counts) and criminal sexual act 3rd degree resulting in a custodial sentence of 42 months to 7 years. Convictions for criminal contempt and disobeying the Court in Southampton, New York followed in October 2008. Joy was also convicted of failure to register as a sex offender in the District of Connecticut on May 20, 2015 and was sentenced to 27 months of incarceration to be followed by 60 months of supervised release. His term of supervised release in the District of Connecticut was violated in March of 2017 and he was sentenced to 7 months of incarceration with no supervision to follow.

24. On or about February 16, 2019, Waterbury PD responded to a location on Laurel Street in Waterbury, Connecticut, where Joy was believed to reside. An officer spoke with Joy's sister about Joy and McGrath. The sister and other family members at the apartment offered general information, but claimed to have no knowledge of Joy's location or the whereabouts of McGrath and her three children. A detective spoke with Joy's mother and another family member, who stated that Joy owned and drove a red/burgundy Volvo.

25. While the detectives were at Joy's residence, Joy's sister received an incoming call from "Lester" on her cell phone with his photo displayed. A detective answered the phone and identified himself as a Waterbury Police Detective. He asked Joy where he was located and Joy stated he was at a rest stop on the New York/Connecticut line. The detective asked if Joy knew the location of Crystal McGrath and her three children. Joy stated that he picked them up at the McDonald's in Waterbury and dropped them off at Metro North in New Haven at 12:35pm. Joy stated that he was driving a grey SUV Nissan or Dodge and that he was on his way back to Waterbury. Joy was told that the Waterbury PD was looking for McGrath and the children and that he was now part of an ongoing investigation and needed to respond to the Waterbury PD. Joy stated he would come to the police station. Joy never responded to the police department and his phone went directly to voice mail when officers attempted to contact him again.

26. On or about February 16, 2019, the children's grandmother was interviewed by Waterbury PD. The grandmother advised that Lester Joy had traveled to Delaware with McGrath to visit the children but had always stayed in the car when McGrath was in the home. In the past, the grandmother observed Joy driving a red car. The grandmother stated that she knew that Joy has been in Court with McGrath when there were custody hearings and that Joy knew that McGrath does not have custody of the children. Waterbury PD confirmed this information with McGrath's DCF caseworker, who attempted to identify Joy at one of the court proceedings with McGrath and the grandmother, but Joy would not tell her his name.

27. On or about February 17, 2019, a Waterbury PD detective contacted Joy's brother using a cellular telephone number. Joy's brother stated that he called the Waterbury PD the previous day after learning from family about his brother, Lester Joy, being involved in a child custody incident with McGrath. Joy's brother offered information about the Volvo and stated it is

an older model, early 2000, burgundy in color, with a college sticker and Army placard on the back. The brother did not think the car was registered. He also stated Lester knew about the custody issues with McGrath's children and that she was not supposed to have them. Joy's brother also stated Lester had taken McGrath to Delaware to the grandmother's house to see the children. The brother stated the two are together and believes that Lester had left the State of Connecticut and may go to his godmother's home, somewhere in the Carolinas. The brother stated that the godmother is around 70 years of age. Joy's brother tried calling Lester at his number (203) 996-2246, but it was going to voicemail.

28. On or about February 17, 2019, arrest warrants for Joy and McGrath were prepared by Waterbury PD and issued by a Superior Court Judge in State of Connecticut for three counts of custodial interference 1st degree (CGS § 53a-97) and three counts of risk of injury to a minor (CGS § 53a-21).

29. On or about February 17, 2019, Waterbury PD conducted an emergency "GPS" location search on Joy's cellular phone, (203) 996-2246. The service provider, Sprint, stated the cellular number was utilizing a cellular tower located north of St. Augustine, Florida, near I-95 highway and Route 16.

30. Waterbury PD requested assistance from United States Marshals Service (USMS). On or about February 19, 2019, DUSM James Masterson conducted a GPS Triangulation of the area, LPR IS, in Saint Augustine, Florida, where Joy's cellular phone was last located. Masterson was able to develop a possible license plate 417YTY on the red Volvo. Task Force Officers in that location looked for the vehicle and conducted an interview with McGrath's mother, but did not find McGrath, Joy or the children at this location.

31. On or about February 22, 2019, DUSM Masterson provided Waterbury PD information that on or about February 16, 2019, Joy and McGrath used a credit card to pay for a room at the Red Carpet Inn, 1245 State, Route 10, East Whippany, New Jersey. Information provided by Red Carpet Inn management confirmed that Joy and McGrath stayed at that hotel. Joy gave a copy of his Connecticut identification to the hotel staff. According to the registry, Joy checked in around 3:00pm and left that night.

32. Based on the above information, DUSM Masterson requested credit-reporting information from credit reporting sources used by the USMS. Financial information obtained from those sources showed that both Joy and McGrath had credit cards associated with Axos Bank, 4350 La Jolla Village Drive, Suite 100 San Diego, California 92122.

33. On February 26, 2019, USMS Task Force members obtained a Connecticut State search warrant to monitor the use of the debit card utilized by Joy and McGrath. According to the records provided by the bank, on February 23, 2019, both Joy and McGrath used the debit card at a McDonald's restaurant in Juarez, Mexico. They also used it on February 25, 2019, at a convenience store in Juarez, Mexico. On February 27, 2019, they used the debit card at an ATM and a Walmart store in Juarez, Mexico. According to the records, children's clothing and toys were purchased.

34. On or about February 26, 2019, it was learned through investigative efforts that the United States Marshals in El Paso, Texas had a possible location for Joy and McGrath in Juarez, Mexico. Those officers notified Mexican authorities, who began to search local hotels in the Juarez border area. The Mexican authorities made attempts at a number of hotels in the area but were unsuccessful in locating suspects Joy, McGrath and the children.

35. On or about March 06, 2019, EI Paso United States Marshals ("USM") Deputies traveled to Juarez, Mexico and met with Mexican authorities. EI Paso USM and Mexican Officers located a hotel were Joy, McGrath and the children had stayed several days prior. The hotel staff advised that Joy and McGrath were operating what they believed to be a red Volvo automobile.

36. On or about March 08, 2019, DUSM Masterson advised that Mexican authorities had located Joy and McGrath in the city of Mazatlán in Mexico. Authorities there established surveillance on Joy and McGrath at a home. Authorities were conducting this surveillance to determine the whereabouts and safety of the children prior to detaining Joy and McGrath as illegal immigrants in their country.

37. On or about March 09, 2019, DUSM Masterson advised that Joy, McGrath, and the children had been located and detained in Mazatlán, Mexico. All five persons were determined to be in the country illegally and without passports.

38. On or about March 12, 2019, Joy and McGrath were deported from Mazatlán Mexico to Denton, Texas. Upon their arrival, they were arrested by the Denton County Sheriff's Office as fugitives from justice based on warrants that had been issued in the state of Connecticut. On March 15, 2019, the children were returned to the U.S. with the assistance of DCF services and returned to the custody of their grandmother.

39. On or about March 29, 2019, following her return to Connecticut, Waterbury detectives brought McGrath to the Waterbury PD. At that time, McGrath was read her constitutional rights. Following the written waiver of her rights, McGrath provided the following information to Waterbury PD detectives.

40. McGrath advised that she "did it" and that she was surprised that it took so long to find her and the children. McGrath stated that she and Joy had planned to take the children and

drive to a non-extraditable country in South America. McGrath stated that she planned this because she was frustrated with DCF and the courts.

41. McGrath agreed to provide a statement in written form. In that statement, McGrath stated that she took the three kids from McDonald's in Waterbury and then drove to pick up Joy on Laurel Street in the maroon Volvo. McGrath then stated they drove out of Connecticut, stopping in Florida, Texas, and then crossed into Mexico. After McGrath signed the statement, she asked if she could just plead guilty to get it over with and just start serving her sentence.

42. On or about March 30, 2019, Waterbury PD detectives returned from Texas with Joy. During the trip back to Connecticut, Joy stated that he did not wish to provide a statement. Joy further stated that it was all in his wife's hands. A detective asked Joy who his wife was and Joy replied "Crystal". Joy stated that he views Crystal as his wife, even though they are not married yet. Joy stated that he would talk about the vacation they took to Mexico and that he has been there in the past.

43. At the Waterbury PD, Joy was asked again if he wished to give a statement. Joy again stated that he did not wish to give a statement. The existing arrest warrants were then served on both Joy and McGrath for three counts each of custodial interference first degree and three counts each of risk of injury.

44. Items were seized from the property of both McGrath and Joy. When Joy was extradited from Texas to Connecticut, his property included, among other items to include a FBI cap, two envelopes (addressed to Lester Joy with his inmate number) containing letters of correspondence between Joy and McGrath that were written during the period of time that they were awaiting extradition to Connecticut. Three cellular phones were also transferred from McGrath's property while she was in custody in Texas to the Waterbury detectives who brought

her back to Connecticut. These cellular phones included (1) one pink Samsung cell phone IMEI 354664/05/067256/2; (2) one black/gray Alcatel cell phone IMEI 015295003034518; and (3) one silver Samsung cell phone IMEI 354255097556189. The cellular phones were taken into the custody of the Federal Bureau of Investigation on September 10, 2019.

45. Based on my training and experience, your Affiant knows that it is common for fugitives to use cellular telephones to mask their whereabouts and avoid apprehension by law enforcement. Your Affiant believes that Joy and McGrath utilized these cellular telephones to correspond with one another and possibly others about the details of their plan to leave Connecticut with McGrath's children. The cellular telephones may also contain information related to research regarding the planning of their travel to Mexico.

46. Based on my training and experience, I believe that any and all data contained within the TARGET DEVICES at the time the Waterbury PD seized is still be on the TARGET DEVICES as the devices have remained in the custody of law enforcement since their seizure.

47. Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premise. Consequently, I respectfully submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

48. Based on the aforementioned factual information, there is probable cause to believe and I do believe that the TARGET DEVICES, as more fully described in Attachment A to this affidavit, contain contraband, fruits, instrumentalities and evidence of the possible violations of the TARGET OFFENSES to include, but not limited to violations of Title 18, United States Code, Section 1201 (kidnapping), Title 18, United States Code, Section 1204, (international parental

kidnapping (McGrath) and Title 18, United States Code, Section 2250 (the Sex Offender Registration and Notification Act ("SORNA") (for Joy), or material otherwise criminally possessed, or property that is or has been used as the means of committing the TARGET OFFENSES.

49. In consideration of the foregoing, I respectfully request that this Court issue an order authorizing the search and seizure of the contents of the TARGET DEVICES, as more fully described in Attachment A, for the items, materials and records more specifically identified in Attachment B.

*Anabela Sharp*
Anabela Sharp
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this 24th day of September, 2019

_/s/ Robert M. Spector_
HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT

## ATTACHMENT A

### Property to Be Searched

The property to be searched are the following electronic devices (each a "TARGET DEVICE" and together the "TARGET DEVICES"), which were obtained by the Federal Bureau of Investigation in New Haven, Connecticut on September 10, 2019:

    b.    One dark pink Samsung cell phone, IMEI 354664/05/067256/2;

    c.    One black/gray Alcatel cell phone IMEI 015295003034518; and

    d.    One silver Samsung cell phone, IMEI 354255097556189

## ATTACHMENT B

### Particular Things to be Seized

For the time period beginning February 1, 2019 through and including March 30, 2019:

All records, information, photographs, images, videos, call logs, contacts, text messages, internet browsing history, and calendars, in any format, including any associated metadata, EXIF information, and geo-location information, that constitute fruits, evidence and instrumentalities of the crimes of, in violation of 18 U.S.C. §§ 1201, 1204 and 2250, (collectively, the "TARGET OFFENSES").